## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| GOLDEN EYE TECHNOLOGIES LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:25-cv-00898 |
| | § | |
| CISCO SYSTEMS, INC., | § | JURY TRIAL DEMANDED |
| | § | |
| Defendant. | § | |
| | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Golden Eye Technologies LLC files this Complaint in this Eastern District of Texas (the "District") against Defendant Cisco Systems, Inc. for infringement of U.S. Patent No. 9,271,243 (the "'243 patent"), U.S. Patent No. 9,344,978 (the "'978 patent"), U.S. Patent No. 9,918,236 ("the "'236 patent"), U.S. Patent No. 9,717,037 (the "'037 patent"), and U.S. Patent No. 10,051,556 (the "'556 patent").

## THE PARTIES

1.      Golden Eye Technologies LLC ("Golden Eye" or "Plaintiff") is a Texas limited liability company, located at 1000 Heritage Center Circle, Suite 508, Round Rock, TX 78664.

2.      On information and belief, Defendant Cisco Systems, Inc. ("Defendant" or "Cisco") is a publicly traded corporation formed and organized under the laws of Delaware with its principal executive offices and corporate headquarters located at 170 West Tasman Drive, San Jose, CA 95134. Cisco is registered to do business in Texas, and its registered agent for service is Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78701-3218. *See* TEXAS SECRETARY OF STATE, https://direct.sos.state.tx.us/ at Filing No. 8243306 (showing Cisco's 2024 Public

Information Report in Texas) (last visited June 9, 2025). Cisco's stock is traded in the NASDAQ stock market under the symbol "CSCO."

3.       Cisco "designs and sells a broad range of technologies that help to power, secure, and draw insights from the Internet." *See Cisco 2024 Annual Report* at page 19, Cisco, *available for download at* https://s2.q4cdn.com/951347115/files/doc_financials/2024/ar/2024-Cisco-Full-Annual-Report.pdf (last visited June 9, 2025) (citations to the annual report are made to the pagination of the pdf file, not internal page numbers). Cisco conducts its business across the globe in three geographic segments: "Americas; Europe, Middle East, and Africa (EMEA); and Asia Pacific, Japan, and China (APJC)." *Id*. Cisco's products are grouped into "Networking, Security, Collaboration and Observability" categories and provide "a broad range of services offerings, including technical support services and advanced services, also known as lifecycle services." *Id*. Cisco's customers "include businesses of all sizes, public institutions, governments, and service providers, including large webscale providers," and such customers "look to [Cisco] as a strategic partner to help them use information technology (IT) to differentiate themselves and drive positive business outcomes." *Id*.

4.       Under its Networking category of products, Cisco offers products providing "core networking technologies of switching, routing, wireless, and servers," which consist of "both hardware and software offerings, including software licenses and software-as-a-service (SaaS)." *Id*. at 3. In its "Wireless portfolio," Cisco provides "indoor and outdoor wireless coverage designed for seamless roaming use of voice, video, and data applications," including "wireless access points and controllers that are on-premise and cloud managed." *Id.* at 21.

5.       Cisco maintains a corporate presence in the United States, including in Texas and this District, via at least its research, design, development, manufacture, use, importation, offers for

sale, and/or sales of Cisco products in or into the United States, including, for example, on behalf of, in conjunction with, for, and/or via customers in the United States and Cisco's alter egos, related entities and/or wholly controlled U.S.-based subsidiaries. Such products and related services include, but are not limited to, Cisco's "Networking" products and related services, comprising at least Cisco Catalyst 9100 series Access Points, Cisco Meraki-branded Access Points, Cisco Aironet 4800, 3800, and 2800 Series Access Points, Cisco Business 150AX Access Point, Cisco 3504, 5520, 8540, 9800 Wireless Controllers, and Virtual Wireless Controllers. Cisco offers these products "both directly and indirectly through a variety of channels with support from our sales workforce," with "[a] substantial portion of our [Cisco's] products and services is sold indirectly through channel partners, and the remainder is sold through direct sales." *See Cisco 2024 Annual Report* at 23. Such channel partners "include systems integrators, service providers, other third-party resellers, and distributors." *Id*. Cisco operates across the U.S., in Texas, and this District, via at least its corporate locations, which include its headquarters in San Jose, California, two offices in Austin, Texas, and a substantial operation in Richardson, Texas.

6.    As a result, via at least Cisco's established distribution channels operated and maintained by Cisco, its alter egos and Cisco's U.S.-based subsidiaries, companies, segments and brands, Cisco products are distributed, sold, advertised, and used nationwide, including being sold to consumers via Cisco distributors and channel partners operating in Texas and this District. Thus, Cisco does business in the United States, the State of Texas, and this District.

## JURISDICTION AND VENUE

7.    This action arises under the patent laws of the United States, namely 35 U.S.C. §§ 271, 281, and 284-285, among others.

8.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

9.    On information and belief, Defendant Cisco is subject to this Court's specific and general personal jurisdiction pursuant to due process and/or the Texas Long Arm Statute, due at least to its substantial business in this State and this District, including: (A) at least part of its infringing activities alleged herein which purposefully avail the Defendant of the privilege of conducting those activities in this state and this District and, thus, submits itself to the jurisdiction of this Court; and (B) regularly doing or soliciting business, engaging in other persistent conduct targeting residents of Texas and this District, and/or deriving substantial revenue from infringing goods offered for sale, sold, and imported and services provided to and targeting Texas residents and residents of this District vicariously through and/or in concert with at least its alter egos, intermediaries, agents, distributors, importers, and/or subsidiaries. For example, Cisco has been registered to do business and has conducted business in Texas (including via its online presence at least at www.cisco.com) since at least 1989. Moreover, Cisco owns and operates a branch/distribution facility in this District where employees and/or agents of Cisco work to develop, manufacture, test, store, distribute, and sell Cisco products, including offering and provisioning related services and administration of the Cisco business. This facility is located in Collin County, Texas at 2300 East President George Bush Highway, Richardson, TX 75082. *See Find a Cisco office near you*, CISCO, https://www.cisco.com/site/us/en/about/contact-cisco/office-locations.html (last visited June 9, 2025).

10.    Defendant Cisco is further responsible for developing, manufacturing, importing, shipping, distributing, selling, offering for sale, delivering, and using infringing Cisco products, including at least Cisco Catalyst 9100 series Access Points, Cisco Meraki-branded Access Points, Cisco Aironet 4800, 3800, and 2800 Series Access Points, Cisco Business 150AX Access Point, Cisco 3504, 5520, 8540, 9800 Wireless Controllers, and Virtual Wireless Controllers in established

distribution channels in the stream of commerce in the U.S., including in Texas and this District. For example, Cisco distributes its products to residents of Texas and this District, via channel partners, systems integrators, service providers, other third-party resellers, distributors, and contract manufacturers. Cisco also maintains a significant physical presence in this District via Cisco's offices located at least in Richardson, Texas. Cisco also maintains offices in Austin, Texas, at 12515 Research Blvd and 11501 Burnet Road. *Id.* Defendant Cisco, therefore, has purposefully directed its activities in Texas and should reasonably anticipate being brought in this Court.

11.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(c) and 1400(b). As alleged herein, Defendant Cisco has committed acts of infringement in this District and has one or more regular and established places of business in this District. One such regular and established place of business is located in Collin County at 2300 East President George Bush Highway, Richardson, TX 75082. *Id.* Cisco utilizes this location for Cisco's business, via Cisco's employees and/or agents, to design, develop, manufacture, store, distribute, sell, import, and use (including via testing) Cisco products in this District, Texas, and the U.S. Accordingly, Defendant Cisco may be sued in this District under 28 U.S.C. § 1400(b).

12.    On information and belief, Defendant Cisco has significant ties to, and presence in, the State of Texas (at least since 1989) and the Eastern District of Texas, making venue in this District both proper and convenient for this action.

## THE ASSERTED PATENTS AND TECHNOLOGY

13.    The Asserted Patents cover various aspects of controlling wireless access points and access point wireless controllers, including, but not limited to, optimizing network coverage and capacity under an environment of interference, forming service zones by controlling transmission power of a signal transmitted to user equipment where one user equipment is located at a cell center

area and another user equipment is located at a cell edge area, and providing an active scan method by using a probe request frame including output information of a station.

14.     The '243 patent describes devices for controlling wireless access points. The disclosed devices control a wireless access point by utilizing a grouping unit to group wireless access points using a same channel based on channel use information received from the wireless access points; a map generator to compute a received signal strength indicator (RSSI) between the grouped wireless access points and an output strength value for each of the grouped wireless access points; an extractor to extract a wireless access point having a highest RSSI value among the grouped wireless access points, if interference occurs between the grouped wireless access points; and an optimal output strength value calculator to compute a corrected output strength value based on the highest RSSI value of the extracted wireless access point, a predetermined threshold value of the RSSI between the grouped wireless access points, and a currently used output strength value.

15.     The '978 patent involves providing a wireless local area network (LAN) service via an access point. The access point disclosed in the '978 point provides a first access point processor that connects to a first user equipment located approximately at a central area of an associated cell, and a second access point processor that connects to a second user equipment located approximately at an edge area of the associated cell. A first probe response control unit controls the first processor to transmit a probe response signal to the first user equipment only when an associated probe request signal from the first user equipment has a signal strength higher than a probe response threshold. A second probe response control unit controls the second access point processor to transmit a probe response signal to the second user equipment only when an associated probe request signal from the second user equipment has a signal strength lower than the probe response threshold.

16.     The '236 patent involves forming multiple service zones within a corresponding cell of network coverage. A first access point processor forms a first service zone for a first user equipment located at the center area of a cell. A second access point processor forms a second service zone for a second user equipment located at an edge area of the cell. The first access point processor transmits a first management frame to the first user equipment using a transmission power lower than that used by the second access point processor for transmitting a second management frame to the second user equipment. The first access point processor transmits a first probe response signal to the first user equipment only when a first probe request signal of the first user equipment has a signal strength higher than a probe response threshold. The second access point processor transmits a second probe response signal to the second user equipment only when a second probe request signal of the second user equipment has a signal strength lower than the probe response threshold.

17.     The '037 patent involves access point scan methods performed by an access point. The methods comprise receiving a probe request frame that includes signal strength information of a station is received from the station. Information about uplink quality is acquired based on signal strength that is included in the probe request frame. A probe response frame is transmitted based on whether the uplink quality satisfies a predetermined standard. Access is granted based on the probe response frame and a maximum probe response time, which comprises a preset maximum time period during which the station is required to wait for probe response frames from the access points.

18.     The '556 patent involves access point scan methods performed by an access point. A probe request frame is received from a station. The probe request frame includes information on a signal strength. A probe response frame is transmitted to the station in response to the probe

request frame based on the information on the signal strength. The station's access to the access point is based on the probe response frame and a maximum probe response time.

19.     On information and belief, a significant portion of the operating revenue of Defendant Cisco is derived from the manufacture and sale of at least Cisco's Networking products. *See Cisco 2024 Annual Report* at 102 ("We design and sell IP-based networking and other products related to the communications and IT industry and provide services associated with these products and their use."). For example, Defendant Cisco utilizes its channel partners, systems integrators, service providers, other third-party resellers, distributors, and contract manufacturers to provide Cisco's Networking products and related services, including access points and controllers, and related services in the U.S. For the year 2024, Defendant reported $29.229 billion in "Networking" revenue in the Americas. *Id.* On information and belief, Cisco generated the vast majority of the reported revenue from the United States.

20.     The Asserted Patents cover Cisco's Networking products and components, software, services, and processes related to the same that generally provide and control wireless local area networks (LAN) service, including Cisco Catalyst 9100 series Access Points, Cisco Meraki-branded Access Points, Cisco Aironet 4800, 3800, and 2800 Series Access Points, Cisco Business 150AX Access Point, Cisco 3504, 5520, 8540, 9800 Wireless Controllers, and Cisco's Virtual Wireless Controllers (collectively referred to herein as the "Accused Products"). Cisco provides these Accused Products via its distribution channels including its sales representatives, licensed resellers, marketplaces, and partners. *See, e.g., How to buy,* CISCO, https://www.cisco.com/site/us/en/buy/index.html (providing links for how consumers may "Chat with Cisco Sales" or "Work with a Cisco Partner") (last visited July 22, 2025); *Search results for: 'cisco access point',* HARDWARE STORM,

https://hardwarestorm.com/catalogsearch/result/?q=cisco+access+point (advertised as an "authorized partner" of Cisco) (last visited July 22, 2025); *Search Results For: 'Cisco Wireless Controllers'*, HARDWARE STORM, https://hardwarestorm.com/catalogsearch/result/?q=Cisco+Wireless+controllers (last visited July 22, 2025). Defendant's infringing Accused Products include, but are not limited to, wireless access point controllers that optimize network coverage and capacity under an environment of interference [covered by at least the '243 patent]; access points that transmit probe response signals based on the signal strength of an associated probe request signal compared to a probe response threshold [covered by at least the '978 patent and '236 patent]; access point scan methods performed by access points, such methods granting access based on uplink quality standards or signal strength thresholds and maximum probe response times [covered by at least the '037 and '556 patent]. These infringing Accused Products are described in further detail below.

21.     Examples of Cisco's infringing wireless controller products include Cisco 3504, 5520, 8540, 9800, and Virtual Wireless Controllers. *See, e.g., Wireless | All Supported Products*,

CISCO, https://www.cisco.com/c/en/us/support/wireless/index.html (last visited June 18, 2025) (listing Cisco's supported products, including its product line of wireless controllers).



*Cisco 3504 Wireless Controller*, CISCO, *available at* https://www.cisco.com/c/en/us/support/wireless/3504-wireless-controller/model.html (last visited June 18, 2025).



*Cisco 5500 Series Wireless Controllers*, CISCO, *available at* https://www.cisco.com/c/en/us/support/wireless/5500-series-wireless-controllers/series.html (last visited June 26, 2025).



*Cisco 8500 Series Wireless Controllers*, Cisco, *available at*
https://www.cisco.com/c/en/us/support/wireless/8500-series-wireless-controllers/series.html (last
visited June 26, 2025).



*Cisco Catalyst 9800 Series Wireless Controllers*, Cisco, *available at*
https://www.cisco.com/c/en/us/support/wireless/catalyst-9800-series-wireless-
controllers/series.html (last visited August 5, 2025).



*Cisco Virtual Wireless Controller,* Cisco, *available at*
https://www.cisco.com/c/en/us/support/wireless/virtual-wireless-controller/series.html (last
visited June 26, 2025).

22.    Examples of Cisco's infringing access point products include Cisco Catalyst 9100
series Access Points, Cisco Meraki-branded Access Points, Cisco Aironet 4800, 3800, and 2800
Series Access Points, and Cisco Business 150AX Access Point. *See, e.g., Wireless | All Supported
Products,* Cisco, *available at* https://www.cisco.com/c/en/us/support/wireless/index.html (last
visited June 18, 2025) (listing Cisco's supported products, including its product line of wireless
controllers).



*Cisco 9100 Family of Access Points,* Cisco, *available at*
https://www.cisco.com/c/en/us/support/wireless/catalyst-9100ax-access-points/series.html (last
visited June 26, 2025).



*CW9162 Datasheet*, CISCO, *available at*
https://documentation.meraki.com/MR/MR_Overview_and_Specifications/CW9162_Datasheet
(last visited June 26, 2025).



*Ultra-High-Performance Wi-Fi 6E wireless*, CISCO, *available at*
https://documentation.meraki.com/MR/MR_Overview_and_Specifications/MR57_Datasheet
(last visited June 26, 2025).



The 150AX access point extends coverage and capacity to Wi-Fi clients such as smartphones, tablets, and high-performance laptops that have integrated Wi-Fi 6 capabilities, while being backwards compatible with the previous 802.11ac Wave 1 or Wave 2 standards.

**Figure 1.**
Cisco Business 150AX Access Point

*Cisco Business 150AX Access Point Data Sheet*, Cisco, available at https://www.cisco.com/c/en/us/products/collateral/wireless/business-100-series-access-points/business-access-point-ds.html (last visited August 6, 2025).

23.     The '243 patent covers Cisco's wireless controller products components, features, and related services, including providing wireless local area network services to stations in the network. For example, the Accused Products utilize radio resource management and Transmit Power Control features, including a "channel aware" feature to control access points in wireless networks to infringe at least claims of the '243 patent. Cisco's wireless controllers comprise at least "[a] device for controlling a wireless access point" to infringe at least claim 1.

24.     Core components of Cisco's wireless networks include the above-referenced wireless controllers are "enterprise-class high-performance wireless switching platforms that support 802.11a/n/ac/ax and 802.11b/g/n protocols. *See, e.g.*, *Cisco Wireless Controller Configuration Guide*, Release 8.10 Page 2/ 1350, Cisco, *available at*

https://www.cisco.com/c/en/us/td/docs/wireless/controller/8-10/config-guide/b_cg810.html    (last visited June 27, 2025). Cisco's wireless controllers include radio resource management (or "RRM") features that can "automatically adjust to real-time changes in the 802.11 radio frequency (802.11 RF) environment." *Id.*



Source: Cisco Wireless Controller Configuration Guide, Release 8.10 (Page 2/ 1350)

25.    Cisco's wireless controllers utilize "Transmit Power Control" (or "TPC") features, which "increase[] and decrease[] an access point's power in response to changes in the RF environment." *Id.* at 453. This feature "provides enough RF power to achieve the required coverage levels while avoiding channel interference between access points." *Id.*



Source: Cisco Wireless Controller Configuration Guide, Release 8.10 (Page 2/ 1350)

26.    Cisco's wireless controllers include at least a "TPCv1" option that offers a "channel aware mode." *Id.* at 453. This channel aware mode groups wireless access points by "consider[ing] co-channel neighbors" in its calculations relating to TPC. *See, e.g.,* Enterprise Mobility 8.5 Design Guide (Chapter 3, Page 42), CISCO, *available at* https://www.cisco.com/c/dam/en/us/td/docs/wireless/controller/technotes/8-5/cisco-enterprise-mobility-design-guide-8-5.pdf (last visited June 27, 2025).

## TPC – Transmit Power Control

[..]

6.  TPCv1 Channel Aware – This is a new feature added in version 8.5. It adds the ability in TPCv1 to consider co-channel neighbors in it's calculation, which allows a more aggressive assignment by TPC while ensuring that co-channel interference does NOT increase. This generally provides 2-3 dB more power with no consequences over the previous TPCv1 algorithm alone.

Source: Enterprise Mobility 8.5 Design Guide (Chapter 3, Page 42)

27.    On information and belief, the channel aware feature utilizes "information regarding Neighbors channel conditions" in a Neighbor Discovery Protocol (or "NDP"), which is "collected by the RF Group Leader" and "used to determine the structure of the RF Domain." *See* Radio Resource Management White Paper page 10/52, 14-5/52, 22-23/52, CISCO, *available at* https://www.cisco.com/c/en/us/td/docs/wireless/controller/technotes/8-3/b_RRM_White_Paper.html (last visited June 27, 2025). Cisco's wireless controllers provide a grouping unit that groups access points using the same channel based on channel use information, i.e., the "RF Group Leader is the designated controller that will run RRM Algorithms on information it collects from Member controllers." *See id.* at 10/52. Cisco utilizes the wireless controller's channel aware feature to "break down the domain into RF Neighborhoods," which "is a group of AP's that can hear one another." *See id.*

How Does RRM do and what it does?

The high level view of RRM is quite simple. It is a framework of services used to gather relevant over the air information and store it for analysis. Each AP spends time listening within its environment and collecting a variety of utilization statistics. The information collected drives many algorithms (wIDS and rogue detection are examples outside of RRM's algorithms). Each AP will gather information regarding Neighbors (Neighbor Discovery Protocol) channel conditions - Load, Interference, Noise. This information is collected by the RF Group Leader for the entire RF Group and used to determine the structure of the RF Domain first and break down the domain into RF Neighborhoods. An RF Neighborhood is a group of AP's that can hear one another, and as such must have channel and power solutions calculated together.

So the RF Group Leader is the designated controller that will run RRM Algorithm's on information that it collects from Member controllers. It does this by first identifying groups of AP's that are physically close enough to one another and organizing these into groups of RF Neighborhoods. The RF Group Leader is also the repository for the current RRM configurations (for channel and power) that will be used to configure the Algorithms for the RF Group.

Source:  Radio Resource Management White Paper (Page 10/52)

28.     On information and belief, Cisco's TPC feature utilizes an NDP process to generate "RSSI organized lists" that characterize how "other AP's (RX Neighbor)" are heard "and how other AP's hear" TX Neighbors." *See id.* at 41/52.

## What does TPC do?

TPC uses the TX neighbor and RF Neighbor lists generated by the NDP process. RSSI organized lists built on how we hear other AP's (RX Neighbor) and how other AP's hear us (TX Neighbor), to form a picture of how AP is heard by every other AP within the RF Neighborhood and RF Group. Based on this information TPC sets the transmit power of each AP to maximize the coverage and minimize co-channel interference. TPC will adjust the Tx power up or down to meet the required coverage level indicated by the TPC Threshold.

Like DCA, TPC runs on the RF Group leader and is a global algorithm that can be sub configured in RF profiles for groups of AP's in an AP group.

Source:  Radio Resource Management White Paper (Page 41/52)

29.     These lists "form a picture of how every AP is heard by every other AP within the RF Neighborhood and RF Group." As illustrated below, "[b]ased on that information," the TPC feature of Cisco's wireless controllers "sets the transmit power of each AP to maximize coverage and minimize co-channel interference." *See id.* at 43/52.



Figure 25: TPCv1 Smoothing Algorithm function

Source:  Radio Resource Management White Paper (Page 43/52)

30.    On information and belief, Cisco's channel aware feature also "keeps track of [the] loudest radio on the same channel" by extracting the access point having the highest RSSI value to "reduce interference." *See, e.g.*, Cisco's Source: Improve Enterprise WLAN Spectrum Quality using Cisco Advanced RF Features (Page 61/140).



Source: Improve Enterprise WLAN Spectrum Quality using Cisco Advanced RF Features [Page 61/140]

## Transmit Power Control

The controller dynamically controls access point transmit power based on real-time wireless LAN conditions.

The Transmit Power Control (TPC) algorithm increases and decreases an access point's power in response to changes in the RF environment. In most instances, TPC seeks to lower an access point's power to reduce interference, but in the case of a sudden change in the RF coverage, for example, if an access point fails or becomes disabled, TPC can also increase power on the surrounding access points. This feature is different from coverage hole detection, which is primarily concerned with clients. TPC provides enough RF power to achieve the required coverage levels while avoiding channel interference between access points. We recommend that you select TPCv1; TPCv2 option is deprecated. With TPCv1, you can select the channel aware mode; we recommend that you select this option for 5 GHz, and leave it unchecked for 2.4 GHz.

Source: Cisco Wireless Controller Configuration Guide, Release 8.10 (Page 441/ 1350)

31.    Cisco's channel aware feature utilizes the highest RSSI value of an access point in the wireless network to compute a corrected output strength value (i.e., "calculates Tx_ideal power") for a target access point that is based on that highest RSSI value, a "TPCv1_Threshold," and a currently used output strength value of the target access point, i.e., the channel aware feature "evaluates a TPCv1 change recommendation" by "determining if a Tx change is recommended." *See, e.g.*, Cisco's Radio Resource Management White Paper at page 42-43/52, CISCO, *available at*

https://www.cisco.com/c/en/us/td/docs/wireless/controller/technotes/8-

3/b_RRM_White_Paper.pdf (last visited June 27, 2025).

---

**Calulating Tx_Ideal–Ideal Power**

The TPCv1 algorithm runs as a two stage process–first determining what the ideal Tx power for a radio would be (Tx_Ideal).

Tx_ideal = Tx_max + (TPCv1_Threshold - RSSI_3rd)

1.  Tx_Max—the maximum supported power for a given radio
2.  TPCv1_Threshold—User selectable RRM power threshold - default -70 dBm version 4.2 and forward -65 dBm before
3.  RSSI_Third—The Third loudest AP in the AP TX Neighbor list

**Note:** This is the TX–not the RX neighbor–see above

[..]

**Evaluating a TPCv1 Change Recommendation**

[..]

So determining if a Tx change is recommended looks like this:

Tx_Curr - Tx_Ideal = N

•  If N is =/< Hysteresis - No Change is recommended
•  If N is > Hysteresis a change is recommended

Source: Radio Resource Management White Paper (Page 42-43/52)

---

32.     The Accused Products utilize a "Flexible Radio Architecture System" (or "FRA")

that provides "an additional integrated 2.4/5—GHz XOR 'selectable radio' for additional

flexibility" to infringe at least claims of the '978 patent and '236 patent. For example, Cisco

provides at least "access points" (described above) that infringe at least claim 7 of the '978 patent.

*See, e.g., Cisco Aironet Series 2800/3800 Access Point Deployment Guide*, at page 26/62, CISCO,

https://www.cisco.com/c/en/us/td/docs/wireless/controller/technotes/8-

3/b_cisco_aironet_series_2800_3800_access_point_deployment_guide.pdf (last visited June 19,

2025).

**Flexible Radio Architecture (FRA) System**

In addition to the dedicated 5–GHz radio, FRA enabled APs like the AP2800 and AP 3800 contain an additional integrated 2.4/5–GHz XOR "selectable radio" for additional flexibility.

An FRA system uses a special XOR radio that consists of the following:

- 2.4–GHz and 5–GHz on the same silicon
- Allows selection of 2.4–GHz or 5–GHz for serving clients (default is 2.4–GHz)
- Allows serial scanning of all 2.4–GHz and 5–GHz channels (in monitor "WSM" mode)
- Role selection is manual or Automatic–RRM
- Previous WSSI or WSM modules for 3700 were XOR in design
- This feature is now integrated into AP 2800 and AP 3800

The benefits of an FRA system are many and address the following issues:

- Solves the problem of 2.4–GHz over-coverage
- Creating 2 diverse 5–GHz cells doubles the airtime available
- Permits one AP with one Ethernet drop to function like two 5–GHz APs
- Introduces concept of Macro/Micro cells for airtime efficiency
- Allows more bandwidth to be applied to an area within a larger coverage cell

Source:  Cisco Aironet Series 2800/3800 Access Point Deployment Guide (Page 26/62)

33.    In Cisco's FRA, the system utilizes a "special XOR radio" that includes a "[d]edicated microprocessor and memory for each radio band." *See id.* at 42/62.

# AP 2800 and AP 3800 Powering Options

If the AP2800 and AP 3800 are powered from an 802.3af power source the LED will cycle though the colors and the radios will be disabled.

Performance requires power as the AP 2800 and AP 3800 have much more advanced features such as:

1   Dedicated microprocessor and memory for each radio band

2   Dual core processor to manage access point and Ethernet functionality

3   Additional XOR radio and antenna switching circuitry, pushing transceiver count to 12 radios

4   Cisco CleanAir silicon for complete spectrum analysis and interference detection

5   Cisco ClientLink powerful (legacy .11a/g/n and .11ac Wave 1 beamforming)–improving older client connectivity and performance; IEEE specification is limited to only TxBF on 802.11ac Wave-2 clients

6   Additional (auxiliary) Ethernet port, USB and advanced radio functions such as 160 MHz / Dual XOR

7   Support for smart antenna functionality (WSM monitor mode and enhanced location)

8   802.3bz (NBASE-T) mGig Ethernet support (AP 3800)

9   Future hardware expandability using modular technology (AP 3800)

Source:  Cisco Aironet Series 2800/3800 Access Point Deployment Guide (Page 42/62)

34.    As shown below, the FRA XOR radio may be enabled "as a dual 5GHz AP," which creates a "Micro (yellow) and Macro (green)" cell, which forms a first and second service zone, respectively. *Id.* at 28.



35.    Cisco's FRA system also provides "probe suppression" in "intra-cell roaming," which controls a first processor of the access point, where the first processor is associated with a micro cell. The FRA system controls transmission of a probe response signal to a first user equipment (e.g., a probing client) in the wireless network only when a probe request signal from the first user equipment has a higher RSSI than a threshold. *See, e.g., Cisco live | Your Time is Now*,

at Page 70/118, Cisco, *available for download at* https://badger-fi.com/wp-content/uploads/2016/08/2016_usa_pdf_brkewn-3010.pdf (last visited June 19, 2025). Moreover, the FRA system controls a second processor of the access point, where the second processor is associated with a macro cell. The FRA system controls transmission of a probe response signal to a second user equipment (i.e., a probing client) in the wireless network only when a probe request signal from the second user equipment has a lower RSSI than a threshold. *Id.*



36.    Cisco's FRA system also provides that "client that has RSSI at the AP above the Micro cell threshold of -55dBm will be moved to the Micro cell." In at least one implementation of the FRA system, the first processor of the access point associated with the micro cell uses a transmission power to transmit a first management frame that is lower than the transmission power of the second processor of the access point associated with the macro cell. *See, e.g.*, Cisco Aironet Series 2800/3800 Access Point Deployment Guide at page 29-30/62, Cisco, *available at* https://www.cisco.com/c/en/us/td/docs/wireless/controller/technotes/8-3/b_cisco_aironet_series_2800_3800_access_point_deployment_guide.pdf (last visited June 27, 2025).

**Client Roaming from a Macro to Micro Cell**

The most likely scenario is that a client will associate to the Macro cell first as it will have the bigger footprint and transmitting at a greater RF power. So in the figure below, any client that has RSSI at the AP above the Micro cell threshold of -55 dBm will be moved into the Micro cell.

Source: Cisco Aironet Series 2800/3800 Access Point Deployment Guide (Page 29/62)

**Micro and Macro cells on "I" Series Access Points**

The AP 2800i and AP 3800i have integrated antennas and as such, when FRA is enabled and dual 5–GHz operation is selected, only the non-FRA radio can perform the role of a Macro cell or Micro cell. The XOR FRA radio when enabled for 5–GHz must operate using a much lower power and therefore must function as a Micro cell

Source: Cisco Aironet Series 2800/3800 Access Point Deployment Guide (Page 30/62)

37.     The Accused Products include Cisco's access points which communicate with stations to utilize an "enhanced FILS active scanning" procedure. As explained in Cisco's documentation (excerpts copied below) "FILS is part of IEEE 802.11ai Standard," which Cisco utilizes in its 802.11ax access points, "and [FILS] addresses improvements in Network and BSS Discovery, Authentication and Association, DHCP and IP address setup." *See, e.g., Define Wi-Fi 6E Band Operations and Client Connectivity* CISCO, *available at* https://www.cisco.com/c/en/us/support/docs/wireless/catalyst-9166-series-access-points/220526-configure-and-verify-wi-fi-6e-band-opera.html (last visited June 27, 2025).

38.     Cisco's access points (described above) implement active scanning and related probing functionalities of the 802.11ax protocol in Cisco's wireless networks to infringe at least claim 9 (directed to a "method for active scanning performed by an access point") of the '556 patent and claim 13 (directed to a "method for active scanning performed by an access point") of the '037 patent. Cisco's 802.11ax access points communicate with stations in Cisco's wireless networks via "Active Scanning" procedures, which, as explained below, utilize FILS capabilities.



The time – in the order of 20 msec per non-DFS channel or up to 100ms on DFS channel – is already an issue in the 5 GHz band.  It becomes more significant when we realize that a Wi-Fi 6E client can have to scan every one of the 59 possible 20 MHz channels in the band to discover all available access points.

The legacy methods aka Passive Scanning and Active Scanning, do not scale on 6GHz. On 2.4 and 5Ghz, it is used the "hunt-and-seek" method to scan BSSIDs or for APs, either by Passive Scanning or Active Scanning:

Traditionally, wireless devices communicate with access points in a specific exchange of information. Client devices use an active "hunt-and-seek" approach to scan for nearby APs.

*See, e.g., Define Wi-Fi 6E Band Operations and Client Connectivity*, CISCO, *available at* https://www.cisco.com/c/en/us/support/docs/wireless/catalyst-9166-series-access-points/220526-configure-and-verify-wi-fi-6e-band-opera.html (last visited June 27, 2025).

     39.    As shown below, Cisco's infringing access points communicate with stations using an "in-band AP discovery mechanism" with a "Preferred Scanning Channels" (PSC) feature. *See, e.g., Cisco Catalyst CW9166D1 Access Point Deployment Guide,* CISCO, *available at* https://www.cisco.com/c/en/us/products/collateral/wireless/catalyst-9164-series-access-points/catalyst-9166i-9164i-dg.html (Fig. 36, copied below, illustrates an active scanning feature) (last visited August 6, 2025); *see also Define Wi-Fi 6E Band Operations and Client Connectivity*, CISCO, *available at* https://www.cisco.com/c/en/us/support/docs/wireless/catalyst-9166-series-access-points/220526-configure-and-verify-wi-fi-6e-band-opera.html (stating that the "third discovery method in Wi-Fi 6E, which is active, is Preferred Channel Scanning (PSC)"). This PSC feature "designates every fourth 20-MHz channel for active probing by Wi-Fi 6E clients," via probe

requests and probe responses. As shown below, PSC works by offering only PSC channels "as the primary channel with 80 MHz channel bandwidth."



**Preferred Scanning Channels**

Preferred Scanning Channels (PSC) is a feature categorized under DCA that designates every fourth 20-MHz channel for active probing by Wi-Fi 6E clients. It is used when channels are bonded in 80 MHz and restricts scanning down to 15 channels rather than 59, increasing the overall efficiency of RF scanning.

PSC enforcement is disabled by default, and the recommendation is to enable it. The PSC list is provided in the Catalyst 9800 controller interface at Configuration > Tags and Profiles > RF/Radio > [Select an RF Profile] > RRM > DCA, as shown in the figure above. When enabled, only PSC channels will be offered as the primary channel with 80-MHz channel bandwidth. The recommendation is to enable PSC when using 80-MHz bonded channels for more efficient network scanning from both the wireless client and other APs in the network.

The figure below depicts how PSC works.

PSC Channel List:
5, 21, 37, 53, 69, 85, 101, 117, 133, 149, 165, 181, 197, 213 and 229

Figure 36.
Visual presentation of PSC

40.    In Cisco's 802.11ax networks, probe request frames transmitted from a station in the network include signal strength information, via the "received channel power indicator" (RCPI) of a "FILS Request." This RCPI is "[a]n indication of the total channel power (signal, noise, and interference) of a received frame measured on the channel and at the antenna connector used to receive the frame." *See, e.g.*, 802.11ax-2021 - IEEE Standard for Information Technology-- Telecommunications and Information Exchange between Systems Local and Metropolitan Area Networks--Specific Requirements Part 11: Wireless LAN Medium Access Control (MAC) and Physical Layer (PHY) Specifications Amendment 1: Enhancements for High-Efficiency WLAN at Sections 9.3.3.9 (Probe Request frame format), 9.4.2.177 (FILS Request Parameters element), 11.1.4.3.2 (Active scanning procedure for a non-DMG STA), and 11.1.4.3.4 (Criteria for sending a response).



**9.4.2.177 FILS Request Parameters element(**

The contents of the FILS Request Parameters element in Probe Request frame are used in determining whether to transmit a Probe Response frame as described in 11.1.4.3.4. The FILS Request Parameters element is defined in Figure 9-642.

| Element ID | Length | Element ID Extension | Parameter Control Bitmap | Max Channel time |
|---|---|---|---|---|
| | | | | |

Octets:     1          1          1                    1                    1

| FILS Criteria | Max Delay Limit | Minimum Data Rate | RCPI Limit | OUI Response Criteria |
|---|---|---|---|---|
| | | | | |

Octets:     0 or 1     0 or 1     0 or 3          0 or 1          0 or 2

**Figure 9-642—FILS Request Parameters element format**

**received channel power indicator (RCPI):** An indication of the total channel power (signal, noise, and interference) of a received frame measured on the channel and at the antenna connector used to receive the frame.

    41.    An access point in Cisco's 802.11ax network utilizing active scanning will transmit a probe response frame in response to the probe request frame sent by the station. The probe response frame is based on information in the RCPI, as shown below. *See, e.g., id.* at Section 11.1.4.3.4 (Criteria for sending a response).



**11.1.4.3.4 Criteria for sending a response**

If a STA that receives a Probe Request frame is not in a multiple BSSID set, that STA shall send the Probe Response frame(s), subject to the criteria below. If a STA that receives a Probe Request frame is in a multiple BSSID set, the STA corresponding to the transmitted BSSID shall send the Probe Response frame(s), subject to the criteria below; other STAs in the multiple BSSID set shall not send a Probe Response frame.

[...]

A FILS STA shall not respond to a Probe Request frame if any of the following criteria is met for a FILS Request Parameters element contained in the Probe Request frame:

[...]

5)   If the RCPI Limit field is present in the FILS Request Parameters element and either of the following conditions is true:
— The RCPI of the Probe Request frame > −90 dBm + the RCPI Limit field of the FILS Request Parameters element.
— The RCPI Limit field of the FILS Request Parameters element contains value 255.

Source: 802.11-2020

42.     As shown below, access to an access point (i.e., MLME-JOIN.request, MLME-Authentication.request, and MLME-ASSOCIATE.request) by a station in a Cisco 802.11ax network using the active scan method (i.e., "is a FILS STA") is based on the probe response frame (i.e., "Receive Probe Response," "detect[] a BSS") and a maximum probe response time (i.e., "while the ActiveScanningTime is less than MaxChannelTime"). *See, e.g., id.* at Sections 6.3.4.2 (MLME-JOIN.request), 6.3.5.2 (MLME-Authenticate.request, and 6.3.7.2 (MLME-Associate.request).

---

**11.1.4.3.2 Active scanning procedure for a non-DMG STA**

Upon receipt of the MLME-SCAN.request primitive with ScanType parameter indicating an active scan, a STA shall use the following procedure.

**[...]**

    h)    If the STA is a FILS STA and while the ActiveScanningTimer is less than MaxChannelTime:

        1)    Receive Probe Response, FILS Discovery, and Beacon frames regardless of the receiver address. Process any received FILS Discovery, Probe Response, and Beacon frames.

        2)    If the ReportingOption parameter of the MLME-SCAN.request primitive is IMMEDIATE, and the scanning FILS STA detects a BSS whose MLME-SCAN.confirm primitive has not been issued during the ongoing scan, then an MLME-SCAN.confirm primitive with the ResultCode equal to INTERMEDIATE SCAN RESULT and one or more of BSSDescriptionSet, BSSDescriptionFromFDSet, or BSSDescriptionFromMeasurementPilotSet containing information of the detected BSS is immediately issued.

---

**6.3.4.2 MLME-JOIN.request**

**6.3.4.2.1 Function**

This primitive requests synchronization with a BSS, of which type is infrastructure or independent.

**6.3.4.2.2 Semantics of the service primitive**

The primitive parameters are as follows:

    MLME-JOIN.request(

                              SelectedBSS,

                              JoinFailureTimeout,

                              NAVSyncDelay,

**6.3.5 Authenticate**

**6.3.5.1 Introduction**

This mechanism supports the process of establishing an authentication relationship with a peer MAC entity.

**6.3.5.2 MLME-AUTHENTICATE.request**

**6.3.5.2.1 Function**

This primitive requests authentication with a specified peer MAC entity.

**6.3.7 Associate**

**6.3.7.1 Introduction**

The following primitives describe how a STA becomes associated with an AP.

**6.3.7.2 MLME-ASSOCIATE.request**

**6.3.7.2.1 Function**

This primitive requests association with a specified peer MAC entity that is within an AP.

43.    In a Cisco 802.11ax network, the active scanning procedure employed by Cisco's wireless network devices (i.e., "FILS" access points using an "active scanning procedure") provides an access of the station to the access point that is based on the probe response and a maximum probe response time (i.e., the MaxChannelTime of the network). *See, e.g.*, *id.* at Section 11.1.4.3.2.

---

**11.1.4.3.2 Active scanning procedure for a non-DMG STA**

Upon receipt of the MLME-SCAN.request primitive with ScanType parameter indicating an active scan, a STA shall use the following procedure.

**[...]**

    h)   If the STA is a FILS STA and while the ActiveScanningTimer is less than MaxChannelTime:

        1)  Receive Probe Response, FILS Discovery, and Beacon frames regardless of the receiver address. Process any received FILS Discovery, Probe Response, and Beacon frames.

        2)  If the ReportingOption parameter of the MLME-SCAN.request primitive is IMMEDIATE, and the scanning FILS STA detects a BSS whose MLME-SCAN.confirm primitive has not been issued during the ongoing scan, then an MLME-SCAN.confirm primitive with the ResultCode equal to INTERMEDIATE_SCAN_RESULT and one or more of BSSDescriptionSet, BSSDescriptionFromFDSet, or BSSDescriptionFromMeasurementPilotSet containing information of the detected BSS is immediately issued.

**[...]**

    j)   Process all probe responses received until the timer reaches MaxChannelTime, constructing BSSDescriptions corresponding to the probe responses that match the criteria specified in the MLME-SCAN.request primitive.

---

## COUNT I

### (INFRINGEMENT OF U.S. PATENT NO. 9,271,243)

44.    Plaintiff incorporates paragraphs 1 through 43 herein by reference.

45.    Plaintiff is the assignee of the '243 patent, entitled "Wireless access point and method and device for controlling wireless access point," with ownership of all substantial rights in the '243 patent, including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

46.    The '243 patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code. The '243 patent issued from U.S. Patent Application No. 14/123,672.

47.    Defendant has and continues to directly and/or indirectly infringe (by inducement and contributory infringement) one or more claims of the '243 patent in this District and elsewhere in Texas and the United States.

48.    On information and belief, the Defendant Cisco designs, develops, manufactures, imports, distributes, offers to sell, sells, and uses the accused Cisco wireless controllers (i.e., Cisco

3504, 5520, 8540, 9800, and Virtual Wireless Controllers), including via the activities of Cisco's alter egos, intermediaries, agents, distributors, importers, customers, subsidiaries, and/or consumers and via the activities of Cisco's members, segments, companies and/or brands.

49.     Cisco directly infringes the '243 patent via 35 U.S.C. § 271(a) by manufacturing (including via contract manufacturers), offering for sale, selling, using (including via testing), and/or importing the Accused Products, their components, and/or products containing the same that incorporate the fundamental technologies covered by the '243 patent to, for example, its importers, online stores, distribution partners, retailers, channel partners, systems integrators, service providers, other third-party resellers, distributors, consumers and other users. Furthermore, on information and belief, Cisco designs the Accused Products for U.S. consumers, makes and sells the Accused Products outside of the United States, delivers those products to related entities, subsidiaries, importers, online stores, distribution partners, retailers, channel partners, systems integrators, service providers, other third-party resellers, distributors, consumers and other users in the United States, or in the case that it delivers the Accused Products outside of the United States it does so intending and/or knowing that those products are destined for the United States and/or designing those products for sale and use in the United States, thereby directly infringing the '243 patent. *See, e.g., Lake Cherokee Hard Drive Techs., LLC. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex. 2013) (denying summary judgment and allowing presentation to jury as to "whether accused products manufactured and delivered abroad but imported into the United States market by downstream customers … constitute an infringing sale under § 271(a)").

50.     Furthermore, Defendant Cisco directly infringes the '243 patent through its direct involvement in the activities of Cisco's alter egos, intermediaries, agents, distributors, importers, customers, subsidiaries, members, segments, companies, brands, and/or consumers, including by

designing the Accused Products for U.S. consumers and selling and offering for sale the Accused Products directly to its related entities and importing the Accused Products into the United States for its related entities. On information and belief, Cisco and its alter egos, intermediaries, agents, distributors, importers, customers, subsidiaries, members, segments, companies, brands, and/or consumers conduct activities that constitute direct infringement of the '243 patent under 35 U.S.C. § 271(a) by importing, offering for sale, selling, and/or using (including via testing) those Accused Products in the U.S. on behalf of and for the benefit of Cisco. Defendant Cisco is vicariously liable for the infringing conduct of its alter egos, intermediaries, agents, distributors, importers, subsidiaries, members, segments, companies, and/or brands (under both the alter ego and agency theories). On information and belief, Defendant Cisco and its alter egos, intermediaries, agents, distributors, importers, subsidiaries, members, segments, companies, brands are essentially the same company (i.e., "Cisco"), operating in the U.S. via at least the Catalyst, Meraki, and Aironet brands, segments, mergers, or acquisitions of Cisco. Moreover, Cisco, as the parent company, along with its related entities, has the right and ability to control and/or delegate the control of the infringing activities of those subsidiary entities such that Cisco receives a direct financial benefit from that infringement.

51.     Defendant infringes claim 1 of the '243 patent via the Accused Products that provide a transmit power control (TPC) feature which "increases or decreases an access point's power in response to changes in the RF environment" (*see, e.g.*, Cisco Wireless Controller Configuration Guide, Release 8.10, page 2/1350, CISCO, *available at* https://www.cisco.com/c/en/us/td/docs/wireless/controller/8-10/config-guide/b_cg810.html (last visited June 27, 2025)), including, but not limited to Defendant's wireless controllers, their components, software/firmware, services, processes, methods, and related accessories.

52.     Those Accused Products include "[a] device for controlling a wireless access point" comprising the limitations of claim 1. The technology discussion above and the example Accused Products provide context for Plaintiff's allegations that each of those limitations is met. For example, the Accused Products include a grouping unit configured to group wireless access points using a same channel based on channel use information received from the wireless access points, a map generator configured to compute a received signal strength indicator (RSSI) between the grouped wireless access points and an output strength value for each of the grouped wireless access points; an extractor configured to extract a wireless access point having a highest RSSI value among the grouped wireless access points, if interference occurs between the grouped wireless access points, and an optimal output strength value calculator configured to compute a corrected output strength value based on the highest RSSI value of the extracted wireless access point, a predetermined threshold value of the RSSI between the grouped wireless access points, and a currently used output strength value.

53.     At a minimum, Defendant has known of the '243 patent at least as early as the filing date of this Complaint. In addition, Defendant has known about its infringement of Golden Eye's patent portfolio, including infringement of the '243 patent, since at least its receipt of correspondence from Golden Eye's parent company, Harfang IP, to Cisco dated March 2, 2022. Golden Eye also provided Cisco with claim charts detailing Cisco's infringement of the '243 patent at least as early as March 21, 2022. The parties continued to correspond from March 2022 until at least August 2024. This sequence of correspondence notifies Defendant Cisco that its products practice at least the wireless controller technologies covered by the Golden Eye patent portfolio.

54.     Plaintiff has complied with all requirements of 35 U.S.C. § 287 relating to its assertion of infringement of the '243 patent by Cisco. Specifically, Plaintiff does not make any products subject to the marking requirement of 35 U.S.C. § 287.

55.     On information and belief, since at least the above-mentioned date when Defendant was on notice of its infringement, Defendant has each actively induced, under 35 U.S.C. § 271(b), importers, online stores, distribution partners, retailers, channel partners, systems integrators, service providers, other third-party resellers, distributors, and contract manufacturers, consumers, other users, and other related service providers that import, distribute, purchase, offer for sale, sell, or use (including via testing) the Accused Products that include or are made using all of the limitations of one or more claims of the '243 patent to directly infringe one or more claims of the '243 patent by using (including via testing), offering for sale, selling, and/or importing the Accused Products. Since at least the date of notice provided above, Defendant has conducted infringing activities with knowledge, or with willful blindness of the fact that the induced acts constitute infringement of the '243 patent. On information and belief, Defendant intends to cause, and have taken affirmative steps to induce, infringement by importers, online stores, distribution partners, retailers, channel partners, systems integrators, service providers, other third-party resellers, distributors, and contract manufacturers, consumers, other users, and other related service providers by at least, *inter alia*, creating advertisements that promote the infringing use of the Accused Products, creating and/or maintaining established distribution channels for the Accused Products into and within the United States. Moreover, Defendant manufactures, tests, and certifies the Accused Products in conformity with and to operate within U.S. laws and regulations, including, for example, the FCC and the Wi-Fi Alliance, specifically so that consumers may be induced to purchase and use the Accused Products. Also, Defendant distributes or makes available instructions or manuals for these products to consumers, installers, purchasers and prospective buyers, test and certify the wireless networking features (with for example the Wi-Fi Alliance) in the accused wireless controllers (i.e., Cisco 3504, 5520, 8540, 9800, and Virtual Wireless Controllers), and

provide technical support, product files and videos, or related services for these products to purchasers in the United States. *See, e.g.*, *Configuration Guides*, Cisco, *available at* https://www.cisco.com/c/en/us/support/wireless/catalyst-9800-series-wireless-controllers/products-installation-and-configuration-guides-list.html (providing links where users and consumers may access resources related to Cisco's wireless controllers, such as configuration guides, videos, and feature guides) (last visited June 16, 2025).

56.    Additionally, and alternatively, on information and belief, Cisco distributed, offered for sale, sold, used (including via testing) and/or imported in this District and elsewhere in the United States wireless networking features and processes, via the Accused Products, that formed a part, component, or process that was used by consumers (and others) to infringe the '243 patent. Cisco knew that such features and processes are  specially made and adapted for use in infringing devices and methods claimed by the '243 patent, and that such features and processes are not a staple article or commodity of commerce suitable for substantial non-infringing use. On information and belief, users (e.g., at least Cisco's customers) of the Accused Products directly infringed one or more claims of the '243 patent by using the Accused Product or carrying out claimed methods with those Accused Products in this District and elsewhere in the United States when, for example, utilizing the transmit power control (TPC) feature of the Accused Devices in Cisco's wireless networks to infringe the '243 patent. This constitutes contributory infringement by Cisco under 35 U.S.C. § 271(c).

57.    On information and belief, despite having knowledge of the '243 patent and knowledge that it is directly and/or indirectly infringing one or more claims of the '243 patent, Defendant has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Defendant's infringing activities relative to the '243 patent have been,

and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, characteristic of a pirate, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

58.     Plaintiff Golden Eye has been damaged as a result of Defendant's infringing conduct described in this Count. Defendant is thus liable (including jointly and severally liable with its alter egos, intermediaries, agents, distributors, importers, subsidiaries) to Golden Eye in an amount that adequately compensates Golden Eye for its infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## <u>COUNT II</u>

### (INFRINGEMENT OF U.S. PATENT NO. 9,344,978)

59.     Plaintiff incorporates paragraphs 1 through 58 herein by reference.

60.     Plaintiff is the assignee of the '978 patent, entitled "Access Point Having Multichannel and Multi Transmission Power, Cell Formation Method," with ownership of all substantial rights in the '978 patent, including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

61.     The '978 patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code. The '978 patent issued from U.S. Patent Application No. 13/668, 313.

62.     Defendant has and continues to directly and/or indirectly infringe (by inducement and contributory infringement) one or more claims of the '978 patent in this District and elsewhere in Texas and the United States.

63.     On information and belief, the Defendant Cisco designs, develops, manufactures, imports, distributes, offers to sell, sells, and uses the accused access points (i.e., Cisco Catalyst 9100

series Access Points, Cisco Aironet 4800, 3800, and 2800 Series Access Points, and Meraki-branded MR36 and MR76 Access Points), including via the activities of Cisco's alter egos, intermediaries, agents, distributors, importers, customers, subsidiaries, and/or consumers and via the activities of Cisco's members, segments, companies, and/or brands.

64.    Cisco directly infringes the '978 patent via 35 U.S.C. § 271(a) by manufacturing (including via contract manufacturers), offering for sale, selling, using (including via testing), and/or importing the Accused Products, their components, and/or products containing the same that incorporate the fundamental technologies covered by the '978 patent to, for example, its alter egos, agents, intermediaries, related entities, distributors, dealers, importers, customers, parent, subsidiaries, members, segments, companies, brands, resellers, dealers, OEMs, integrators, installers, and/or consumers. Furthermore, on information and belief, Cisco designs the Accused Products for U.S. consumers, makes and sells the Accused Products outside of the United States, delivers those products to related entities, subsidiaries, online stores, distribution partners, retailers, showrooms, resellers, dealers, installers, customers and other related service providers in the United States, or in the case that it delivers the Accused Products outside of the United States it does so intending and/or knowing that those products are destined for the United States and/or designing those products for sale and use in the United States, thereby directly infringing the '978 patent. *See, e.g., Lake Cherokee Hard Drive Techs., LLC. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex. 2013) (denying summary judgment and allowing presentation to jury as to "whether accused products manufactured and delivered abroad but imported into the United States market by downstream customers … constitute an infringing sale under § 271(a)").

65.    Furthermore, Defendant Cisco directly infringes the '978 patent through its direct involvement in the activities of Cisco's alter ego, intermediaries, agents, distributors, importers,

customers, subsidiaries, members, segments, companies, brands, and/or consumers, including by designing the Accused Products for U.S. consumers and selling and offering for sale the Accused Products directly to its related entities and importing the Accused Products into the United States for its related entities. On information and belief, Cisco and its alter egos, intermediaries, agents, distributors, importers, customers, subsidiaries, members, segments, companies, brands, and/or consumers, conduct activities that constitute direct infringement of the '978 patent under 35 U.S.C. § 271(a) by importing, offering for sale, selling, and/or using (including via testing) those Accused Products in the U.S. on behalf of and for the benefit of Cisco. Defendant Cisco is vicariously liable for the infringing conduct of its alter egos, intermediaries, agents, distributors, importers, subsidiaries, members, segments, companies, and/or brands (under both the alter ego and agency theories). On information and belief, Defendant Cisco and its alter egos, intermediaries, agents, distributors, importers, subsidiaries, members, segments, companies, brands are essentially the same company (i.e., "Cisco"), operating in the U.S. via at least the Catalyst, Meraki, and Aironet brands, segments, mergers, or acquisitions of Cisco. Moreover, Cisco, as the parent company, along with its related entities, has the right and ability to control and/or delegate the control of the infringing activities of those subsidiary entities such that Cisco receives a direct financial benefit from that infringement.

66.     Defendant infringes claim 7 of the '978 patent via the Accused Products that utilize a "Flexible Radio Architecture System" (or "FRA") that provides "an additional integrated 2.4/5—GHz XOR 'selectable radio' for additional flexibility" to infringe the '978 patent. *See, e.g., Cisco Aironet Series 2800/3800 Access Point Deployment Guide*, at page 26/62, CISCO, *available at* https://www.cisco.com/c/en/us/td/docs/wireless/controller/technotes/8-3/b_cisco_aironet_series_2800_3800_access_point_deployment_guide.pdf (last visited June 19,

2025). Such Accused Products include, but are not limited to, Defendant's wireless access point products, their components, software/firmware, processes, methods, and related accessories.

67.    The Accused Products include "[an] access point" comprising the limitations of claim 7. The technology discussion above and the example Accused Products provide context for Plaintiff's allegations that each of those limitations is met. For example, the Accused Products include a first access point processor configured to provide connection to a first user equipment located approximate to a center area of an associated cell, and a second access point processor configured to provide connection to a second user equipment located approximate to an edge area of the associated cell, a first probe response control unit configured to control the first access point processor to transmit a first probe response signal to the first user equipment only when an associated first probe request signal from the first user equipment has signal strength higher than a probe response threshold, and a second probe response control unit configured to control the second access point processor to transmit a second probe response signal to the second user equipment only when an associated second probe request signal from the second user equipment has signal strength lower than the probe response threshold.

68.    At a minimum, Defendant has known of the '978 patent at least as early as the filing date of this Complaint. In addition, Defendant has known about its infringement of Golden Eye's patent portfolio, including infringement of the '978 patent, since at least its receipt of correspondence from Golden Eye's parent company, Harfang IP, to Cisco dated March 2, 2022. Golden Eye also provided Cisco with claim charts detailing Cisco's infringement of the '978 patent at least as early as March 2, 2022. The parties continued to correspond from March 2022 until at least August 2024, including discussions on claim charts. This sequence of correspondence notifies

Defendant Cisco that its products practice at least multichannel and multi-transmission power cell formation technologies covered by the Golden Eye patent portfolio.

69.    Plaintiff has complied with all requirements of 35 U.S.C. § 287 relating to its assertion of infringement of the '978 patent by Cisco. Specifically, Plaintiff does not make any products subject to the marking requirement of 35 U.S.C. § 287.

70.    On information and belief, since at least the above-mentioned date when Defendant was on notice of its infringement, Defendant has actively induced, under 35 U.S.C. § 271(b), importers, online stores, distribution partners, retailers, channel partners, systems integrators, service providers, other third-party resellers, distributors, and contract manufacturers, consumers, other users, and other related service providers that import, distribute, purchase, offer for sale, sell, or use (including via testing) the Accused Products that include or are made using all of the limitations of one or more claims of the '978 patent to directly infringe one or more claims of the '978 patent by using, offering for sale, selling, and/or importing the Accused Products. Since at least the date of notice provided above, Defendant has conducted infringing activities with knowledge, or with willful blindness of the fact that the induced acts constitute infringement of the '978 patent. On information and belief, Defendant intends to cause, and have taken affirmative steps to induce, infringement by importers, online stores, distribution partners, retailers, channel partners, systems integrators, service providers, other third party resellers, distributors, and contract manufacturers, consumers, other users, and other related service providers by at least, *inter alia*, creating advertisements that promote the infringing use of the Accused Products, creating and/or maintaining established distribution channels for the Accused Products into and within the United States. Moreover, Defendant manufactures, tests, and certifies the Accused Products in conformity with and to operate within U.S. laws and regulations, including, for example, the FCC and the Wi-Fi Alliance, specifically so that consumers may be induced to purchase and use the Accused

Products. Also, Defendant distributes or makes available instructions or manuals for these products to consumers, installers, purchasers and prospective buyers, tests and certifies the wireless networking features (with for example the Wi-Fi Alliance) in the accused access points (i.e., Cisco Catalyst 9100 series Access Points and Cisco Aironet 4800, 3800, and 2800 Series Access Points), and provide technical support, product files and videos, or related services for these products to purchasers in the United States. *See, e.g.*, *Wireless access points Resources*, CISCO, *available at* https://www.cisco.com/site/us/en/products/networking/wireless/access-points/resources.html (providing links where users and consumers may access resources related to Cisco's Wireless Access Points, wireless controllers, such as configuration guides, videos, and feature guides) (last visited June 16, 2025).

71.    Additionally, and alternatively, on information and belief, Cisco distributed, offered for sale, sold, used (including via testing) and/or imported in this District and elsewhere in the United States wireless networking features and processes, via the Accused Products, that formed a part, component, or process that was used by consumers (and others) to infringe the '978 patent. Cisco knew that such features and processes are specially made and adapted for use in infringing devices and methods claimed by the '978 patent, and that such features and processes are not a staple article or commodity of commerce suitable for substantial non-infringing use. On information and belief, users (e.g., at least Cisco's customers) of the Accused Products directly infringed one or more claims of the '978 patent by using the Accused Product or carrying out claimed methods with those Accused Products in this District and elsewhere in the United States when, for example, utilizing the "Flexible Radio Architecture System" of the Accused Products (e.g., access points) to provide "an additional integrated 2.4/5—GHz XOR 'selectable radio' for additional flexibility" to

infringe the '978 patent in Cisco's wireless networks to infringe the '978 patent. This constitutes contributory infringement by Cisco under 35 U.S.C. § 271(c).

72.     On information and belief, despite having knowledge of the '978 patent and knowledge that it is directly and/or indirectly infringing one or more claims of the '978 patent, Defendant has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Defendant's infringing activities relative to the '972 patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, characteristic of a pirate, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

73.     Plaintiff Golden Eye has been damaged as a result of Defendant's infringing conduct described in this Count. Defendant is thus liable (including jointly and severally liable with its alter egos, intermediaries, agents, distributors, importers, subsidiaries) to Golden Eye in an amount that adequately compensates Golden Eye for its infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT III

### (INFRINGEMENT OF U.S. PATENT NO. 9,918,236)

74.     Plaintiff incorporates paragraphs 1 through 73 herein by reference.

75.     Plaintiff is the assignee of the '236 patent, entitled "Access Point Having Multichannel and Multi Transmission Power, Cell Formation Method," with ownership of all substantial rights in the '236 patent, including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

76.    The '236 patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code. The '236 patent issued from U.S. Patent Application No. 15/149,050.

77.    Defendant has and continues to directly and/or indirectly infringe (by inducement and contributory infringement) one or more claims of the '236 patent in this District and elsewhere in Texas and the United States.

78.    On information and belief, the Defendant Cisco designs, develops, manufactures, imports, distributes, offers to sell, sells, and uses the accused access points (i.e., Cisco Catalyst 9100 series Access Points, Cisco Aironet 4800, 3800, and 2800 Series Access Points, and Meraki-branded MR36 and MR76 Access Points), including via the activities of Cisco's alter egos, intermediaries, agents, distributors, importers, subsidiaries, and/or customers and via the activities of Cisco's members, segments, companies, and/or brands.

79.    Cisco directly infringes the '236 patent via 35 U.S.C. § 271(a) by manufacturing (including via contract manufacturers), offering for sale, selling, using (including via testing), and/or importing the Accused Products, their components, and/or products containing the same that incorporate the fundamental technologies covered by the '236 patent to, for example, its importers, online stores, distribution partners, retailers, channel partners, system integrators, service providers, other third-party resellers, distributors, consumers and other users. Furthermore, on information and belief, Cisco designs the Accused Products for U.S. consumers, make and sell the Accused Products outside of the United States, deliver those products to related entities, subsidiaries, online stores, distribution partners, retailers, channel partners, systems integrators, service providers, other third-party resellers, distributors, consumers and other users in the United States, or in the case that it delivers the Accused Products outside of the United States it does so intending and/or knowing that

those products are destined for the United States and/or designing those products for sale and use in the United States, thereby directly infringing the '236 patent. *See, e.g., Lake Cherokee Hard Drive Techs., LLC. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex. 2013) (denying summary judgment and allowing presentation to jury as to "whether accused products manufactured and delivered abroad but imported into the United States market by downstream customers … constitute an infringing sale under § 271(a)").

80.     Furthermore, Defendant Cisco directly infringes the '236 patent through its direct involvement in the activities of Cisco's alter ego, intermediaries, agents, distributors, importers, subsidiaries, members, segments, companies, brands, and/or customers, including by designing the Accused Products for U.S. consumers and selling and offering for sale the Accused Products directly to its related entities and importing the Accused Products into the United States for its related entities. On information and belief, Cisco and its alter egos, intermediaries, agents, distributors, importers, subsidiaries, members, segments, companies, brands, and/or consumers, conduct activities that constitute direct infringement of the '236 patent under 35 U.S.C. § 271(a) by importing, offering for sale, selling, and/or using (including via testing) those Accused Products in the U.S. on behalf of and for the benefit of Cisco. Defendant Cisco is vicariously liable for the infringing conduct of its alter egos, intermediaries, agents, distributors, importers, subsidiaries, members, segments, companies, and/or brands (under both the alter ego and agency theories). On information and belief, Defendant Cisco and its alter egos, intermediaries, agents, distributors, importers, subsidiaries, members, segments, companies, brands are essentially the same company (i.e., "Cisco"), operating in the U.S. via at least the Catalyst, Meraki, and Aironet brands, segments, mergers, or acquisitions of Cisco. Moreover, Cisco, as the parent company, along with its related

entities, has the right and ability to control and/or delegate the control of the infringing activities of those subsidiary entities such that Cisco receives a direct financial benefit from that infringement.

81.    For example, Defendant infringes claim 1 of the '236 patent via the Accused Products that utilize a "Flexible Radio Architecture System" (or "FRA") that provides "an additional integrated 2.4/5—GHz XOR 'selectable radio' for additional flexibility" to infringe the '236 patent. *See, e.g., Cisco Aironet Series 2800/3800 Access Point Deployment Guide*, at page 26/62, CISCO, *available at* https://www.cisco.com/c/en/us/td/docs/wireless/controller/technotes/8-3/b_cisco_aironet_series_2800_3800_access_point_deployment_guide.pdf (last visited June 19, 2025). Such Accused Products include, but are not limited to, Defendant's wireless access point products, their components, software/firmware, processes, methods, and related accessories.

82.    Those Accused Products include "[an] access point" comprising the limitations of claim 1. The technology discussion above and the example Accused Products provide context for Plaintiff's allegations that each of those limitations is met. For example, the Accused Products include an access point for forming multiple service zones within a corresponding cell, the access point comprising, a first access point processor configured to form a first service zone for a first user equipment located at a center area of the cell, and a second access point processor configured to form a second service zone for a second user equipment located at an edge area of the cell, wherein the first access point processor is configured to transmit a first management frame to the first user equipment using a transmission power lower than that used by the second access point processor for transmitting a second management frame to the second user equipment, wherein the first access point processor transmits a first probe response signal to the first user equipment only when a first probe request signal of the first user equipment has signal strength higher than a probe response threshold, and wherein the second access point processor transmits a second probe

response signal to the second user equipment only when a second probe request signal of the second user equipment has signal strength lower than the probe response threshold.

83.     At a minimum, Defendant has known of the '236 patent at least as early as the filing date of this Complaint. In addition, Defendant has known about its infringement of Golden Eye's patent portfolio, including infringement of the '236 patent, since at least its receipt of correspondence from Golden Eye's parent company, Harfang IP, to Cisco dated March 2, 2022. Golden Eye also provided Cisco with claim charts detailing Cisco's infringement of the '236 patent at least as early as March 21, 2022. The parties continued to correspond from March 2022 until at least August 2024. This sequence of correspondence notifies Defendant Cisco that its products practice at least the wireless controller technologies covered by the Golden Eye patent portfolio.

84.     Plaintiff has complied with all requirements of 35 U.S.C. § 287 relating to its assertion of infringement of the '243 patent by Cisco. Specifically, Plaintiff does not make any products subject to the marking requirement of 35 U.S.C. § 287.

85.     On information and belief, since at least the above-mentioned date when Defendant was on notice of its infringement, Defendant has actively induced, under 35 U.S.C. § 271(b), importers, online stores, distribution partners, retailers, channel partners, systems integrators, service providers, other third-party resellers, distributors, and contract manufacturers, consumers, other users, and other related service providers that import, distribute, purchase, offer for sale, sell, or use (including via testing) the Accused Products that include or are made using all of the limitations of one or more claims of the '236 patent to directly infringe one or more claims of the '236 patent by using, offering for sale, selling and/or importing the Accused Products. Since at least the date of notice provided above, Defendant has conducted infringing activities with knowledge, or with willful blindness of the fact that the induced acts constitute infringement of the '236 patent. On information and belief, Defendant intends to cause, and have taken affirmative steps to induce,

infringement by importers, online stores, distribution partners, retailers, channel partners, systems integrators, service providers, other third-party resellers, distributors, and contract manufacturers, consumers, other users, and other related service providers by at least, *inter alia*, creating advertisements that promote the infringing use of the Accused Products, creating and/or maintaining established distribution channels for the Accused Products into and within the United States. Moreover, Defendant manufactures, tests, and certifies the Accused Products in conformity with and to operate within U.S. laws and regulations, including, for example, the FCC and the Wi-Fi Alliance, specifically so that consumers may be induced to purchase and use the Accused Products. Also, Defendant distributes or makes available instructions or manuals for these products to consumers, installers, purchasers and prospective buyers, test and certify the wireless networking features (with for example the Wi-Fi Alliance) in the accused access points (i.e., Cisco Catalyst 9100 series Access Points and Cisco Aironet 4800, 3800, and 2800 Series Access Points), and provide technical support, product files and videos, or related services for these products to purchasers in the United States. *See, e.g.*, *Wireless access points Resources*, CISCO, *available at* https://www.cisco.com/site/us/en/products/networking/wireless/access-points/resources.html (providing links where users and consumers may access resources related to Cisco's Wireless Access Points, wireless controllers, such as configuration guides, videos, and feature guides) (last visited June 19, 2025).

86.    Additionally, and alternatively, on information and belief, Cisco distributed, offered for sale, sold, used (including via testing) and/or imported in this District and elsewhere in the United States wireless networking features and processes, via the Accused Products, that formed a part, component, or process that was used by consumers (and others) to infringe the '236 patent. Cisco knew that such features and processes are specially made and adapted for use in infringing

devices and methods claimed by the '236 patent, and that such features and processes are not a staple article or commodity of commerce suitable for substantial non-infringing use. On information and belief, users (e.g., at least Cisco's customers) of the Accused Products directly infringed one or more claims of the '236 patent by using the Accused Product or carrying out claimed methods with those Accused Products in this District and elsewhere in the United States when, for example, utilizing the "Flexible Radio Architecture System" of the Accused Products (e.g., access points) to provide "an additional integrated 2.4/5—GHz XOR 'selectable radio' for additional flexibility" to infringe the '236 patent in Cisco's wireless networks to infringe the '236 patent. This constitutes contributory infringement by Cisco under 35 U.S.C. § 271(c).

87.    On information and belief, despite having knowledge of the '236 patent and knowledge that it is directly and/or indirectly infringing one or more claims of the '236 patent, Defendant has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Each of Defendant's infringing activities relative to the '236 patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, characteristic of a pirate, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

88.    Plaintiff Golden Eye has been damaged as a result of Defendant's infringing conduct described in this Count. Defendant is thus liable (including jointly and severally liable with its alter egos, intermediaries, agents, distributors, importers, subsidiaries) to Golden Eye in an amount that adequately compensates Golden Eye for its infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT IV

### (INFRINGEMENT OF U.S. PATENT NO. 9,717,037)

89.     Plaintiff incorporates paragraphs 1 through 88 herein by reference.

90.     Plaintiff is the assignee of the '037 patent, entitled "Method for Scanning For Access Point in Wireless LAN System," with ownership of all substantial rights in the '037 patent, including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

91.     The '037 patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code. The '037 patent issued from U.S. Patent Application No. 14/411,278.

92.     Defendant has and continues to directly and/or indirectly infringe (by inducement and contributory infringement) one or more claims of the '037 patent in this District and elsewhere in Texas and the United States.

93.     On information and belief, the Defendant Cisco designs, develops, manufactures, imports, distributes, offers to sell, sells, and uses the accused access points (i.e., Cisco Catalyst 9100 series Access Points, Meraki-branded Access Points, and Cisco Business 150AX Access Point), including via the activities of Cisco's alter egos, intermediaries, agents, distributors, importers, customers, subsidiaries, and/or customers and via the activities of Cisco's members, segments, companies, and/or brands.

94.     Cisco directly infringes the '037 patent via 35 U.S.C. § 271(a) by manufacturing (including via contract manufacturers), offering for sale, selling, using (including via testing), and/or importing the Accused Products, their components, and/or products containing the same that incorporate the fundamental technologies covered by the '037 patent to, for example, its importers, online stores, distribution partners, retailers, channel partners, system integrators, service providers,

other third-party resellers, distributors, consumers and other users. Furthermore, on information and belief, Cisco designs the Accused Products for U.S. consumers, make and sell the Accused Products outside of the United States, deliver those products to related entities, subsidiaries, online stores, distribution partners, retailers, channel partners, systems integrators, service providers, other third-party resellers, distributors, consumers and other users in the United States, or in the case that it delivers the Accused Products outside of the United States it does so intending and/or knowing that those products are destined for the United States and/or designing those products for sale and use in the United States, thereby directly infringing the '037 patent. *See, e.g., Lake Cherokee Hard Drive Techs., LLC. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex. 2013) (denying summary judgment and allowing presentation to jury as to "whether accused products manufactured and delivered abroad but imported into the United States market by downstream customers … constitute an infringing sale under § 271(a)").

95.    Furthermore, Defendant Cisco directly infringes the '037 patent through its direct involvement in the activities of its Cisco's alter ego, intermediaries, agents, distributors, importers, subsidiaries, members, segments, companies, brand and/or customers, including by designing the Accused Products for U.S. consumers and selling and offering for sale the Accused Products directly to its related entities and importing the Accused Products into the United States for its related entities. On information and belief, Cisco and its alter egos, intermediaries, agents, distributors, importers, subsidiaries, members, segments, companies, brands, and/or consumers, conduct activities that constitute direct infringement of the '037 patent under 35 U.S.C. § 271(a) by importing, offering for sale, selling, and/or using (including via testing) those Accused Products in the U.S. on behalf of and for the benefit of Cisco. Defendant Cisco is vicariously liable for the infringing conduct of its alter egos, intermediaries, agents, distributors, importers, subsidiaries,

members, segments, companies, and/or brands (under both the alter ego and agency theories). On information and belief, Defendant Cisco and its alter egos, intermediaries, agents, distributors, importers, subsidiaries, members, segments, companies, brands are essentially the same company (i.e., "Cisco"), operating in the U.S. via at least the Catalyst, Meraki, and Aironet brands, segments, mergers, or acquisitions of Cisco. Moreover, Cisco, as the parent company, along with its related entities, has the right and ability to control and/or delegate the control of the infringing activities of those subsidiary entities such that Cisco receives a direct financial benefit from that infringement.

96.    Defendant infringes the '037 patent via Accused Products that utilize an "enhanced FILS active scanning" procedure performed by access points in Cisco's 802.11ax wireless networks. For example, Cisco provides at least "access points" (described above) that implement active scanning and related probing functionalities that communicate with stations in Cisco's wireless networks to infringe at least claim 13 (directed to a "method for active scanning performed by an access point"). Such Accused Products include Defendant's access points, their components, software/firmware, processes, methods, and related accessories. *See, e.g., Cisco Catalyst CW9166D1 Access Point Deployment Guide,* CISCO, *available at* https://www.cisco.com/c/en/us/products/collateral/wireless/catalyst-9164-series-access-points/catalyst-9166i-9164i-dg.html (Fig. 32 describes FILS feature) (last visited June 20, 2025).

97.    Those Accused Products perform an "active scan method performed by an access point," comprising the limitations of claim 13. The technology discussion above and the example Accused Products provide context for Plaintiff's allegations that each of those limitations is met. For example, the Accused Products perform the steps of receiving a probe request frame from a station, the probe request frame including signal strength information of the station, acquiring information about uplink quality based on the signal strength information included in the probe

request frame, transmitting a probe response frame to the station based on whether the uplink quality satisfies a predetermined standard, and granting access to the station based on the probe response frame and a maximum probe response time, wherein the maximum probe response time comprises a preset maximum time period during which the station is required to wait for probe response frames from the access points.

98.    At a minimum, Defendant has known of the '037 patent at least as early as the filing date of this Complaint. In addition, Defendant has known about its infringement of Golden Eye's patent portfolio, including infringement of the '037 patent, since at least its receipt of correspondence from Golden Eye's parent company, Harfang IP, to Cisco dated June 23, 2023. Moreover, claim charts addressing Cisco's infringement of the '037 patent were delivered to Cisco at least as early as June 23, 2023. The parties continued to correspond from June 2023 until at least August 2024. This sequence of correspondence notifies Defendant Cisco that its products practice at least the wireless technologies covered by the Golden Eye patent portfolio.

99.    Plaintiff has complied with all requirements of 35 U.S.C. § 287 relating to its assertion of infringement of the '037 patent by Cisco. Specifically, Plaintiff does not make any products subject to the marking requirement of 35 U.S.C. § 287. Further, the method claims asserted are not subject to the marking requirements of 35 U.S.C. § 287. *See, e.g., Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.*, 559 F.3d 1308, 1316 (Fed. Cir. 2009).

100.    On information and belief, since at least the above-mentioned date when Defendant was on notice of its infringement, Defendant has actively induced, under 35 U.S.C. § 271(b), importers, online stores, distribution partners, retailers, channel partners, systems integrators, service providers, other third-party resellers, distributors, and contract manufacturers, consumers, other users, and other related service providers that import, distribute, purchase, offer for sale, sell,

or use (including via testing) the Accused Products that include or are made using all of the limitations of one or more claims of the '037 patent to directly infringe one or more claims of the '037 patent by using, offering for sale, selling, and/or importing the Accused Products. Since at least the date of notice provided above, Defendant conducted infringing activities with knowledge, or with willful blindness of the fact, that the induced acts constitute infringement of the '037 patent. On information and belief, Defendant intends to cause, and have taken affirmative steps to induce, infringement by importers, online stores, distribution partners, retailers, channel partners, systems integrators, service providers, other third-party resellers, distributors, and contract manufacturers, consumers, other users, and other related service providers by at least, *inter alia*, creating advertisements that promote the infringing use of the Accused Products, creating and/or maintaining established distribution channels for the Accused Products into and within the United States. Moreover, Defendant manufactures, tests, and certifies the Accused Products in conformity with and to operate within U.S. laws and regulations, including, for example, the FCC and the Wi-Fi Alliance, specifically so that consumers may be induced to purchase and use the Accused Products. Also, Defendant distributes or makes available instructions or manuals for these products to consumers, installers, purchasers and prospective buyers, test and certify the wireless networking features (with for example the Wi-Fi Alliance) in accused access points (i.e., Cisco Catalyst 9100 series Access Points and Meraki-branded Access Points), and provide technical support, product files and videos, or related services for these products to purchasers in the United States. *See, e.g., Cisco Catalyst CW9166D1 Access Point Deployment Guide,* CISCO, *available at* https://www.cisco.com/c/en/us/products/collateral/wireless/catalyst-9164-series-access-points/catalyst-9166i-9164i-dg.html (providing instructions for how to enable the FILS feature) (last visited June 20, 2025).

101.    Additionally, and alternatively, on information and belief, Cisco distributed, offered for sale, sold, used (including via testing) and/or imported in this District and elsewhere in the United States wireless networking features and processes, via the Accused Products, that formed a part, component, or process that was used by consumers (and others) to infringe the '037 patent. Cisco knew that such features and processes are specially made and adapted for use in infringing devices and methods claimed by the '037 patent, and that such features and processes are not a staple article or commodity of commerce suitable for substantial non-infringing use. On information and belief, users (e.g., at least Cisco's customers) of the Accused Products directly infringed one or more claims of the '037 patent by using the Accused Product or carrying out claimed methods with those Accused Products in this District and elsewhere in the United States when, for example, utilizing an "enhanced FILS active scanning" procedure performed by access points in Cisco's 802.11ax wireless networks to infringe the '037 patent in Cisco's wireless networks. This constitutes contributory infringement by Cisco under 35 U.S.C. § 271(c).

102.    On information and belief, despite having knowledge of the '037 patent and knowledge that it is directly and/or indirectly infringing one or more claims of the '037 patent, Defendant has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Defendant's infringing activities relative to the '037 patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, characteristic of a pirate, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

103.    Plaintiff Golden Eye has been damaged as a result of Defendant's infringing conduct described in this Count. Defendant is thus liable (including jointly and severally liable with its alter

egos, intermediaries, agents, distributors, importers, subsidiaries) to Golden Eye in an amount that adequately compensates Golden Eye for its infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT V

### (INFRINGEMENT OF U.S. PATENT NO. 10,051,556)

104.    Plaintiff incorporates paragraphs 1 through 103 herein by reference.

105.    Plaintiff is the assignee of the '556 patent, entitled "Method for Scanning For Access Point in Wireless LAN System" with ownership of all substantial rights in the '556 patent, including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

106.    The '556 patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code. The '556 patent issued from U.S. Patent Application No. 15/618,443.

107.    Defendant has and continues to directly and/or indirectly infringe (by inducement and contributory infringement) one or more claims of the '556 patent in this District and elsewhere in Texas and the United States.

108.    On information and belief, the Defendant Cisco designs, develops, manufactures, imports, distributes, offers to sell, sells, and uses the  accused access points (i.e., Cisco Catalyst 9100 series Access Points, Meraki-branded Access Points, and Cisco Business 150AX Access Point), including via the activities of Cisco's alter egos, intermediaries, agents, distributors, importers, customers, subsidiaries, and/or customers and via the activities of Cisco's members, segments, companies, and/or brands.

109.    Cisco directly infringes the '556 patent via 35 U.S.C. § 271(a) by manufacturing (including via contract manufacturers), offering for sale, selling, using (including via testing),

and/or importing the Accused Products, their components, and/or products containing the same that incorporate the fundamental technologies covered by the '556 patent to, for example, its importers, online stores, distribution partners, retailers, channel partners, system integrators, service providers, other third-party resellers, distributors, consumers and other users. Furthermore, on information and belief, Cisco designs the Accused Products for U.S. consumers, makes and sells the Accused Products outside of the United States, delivers those products to related entities, subsidiaries, online stores, distribution partners, retailers, channel partners, systems integrators, service providers, other third-party resellers, distributors, consumers and other users in the United States, or in the case that it delivers the Accused Products outside of the United States it does so intending and/or knowing that those products are destined for the United States and/or designing those products for sale and use in the United States, thereby directly infringing the '556 patent. *See, e.g., Lake Cherokee Hard Drive Techs., LLC. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex. 2013) (denying summary judgment and allowing presentation to jury as to "whether accused products manufactured and delivered abroad but imported into the United States market by downstream customers … constitute an infringing sale under § 271(a)").

110.    Furthermore, Defendant Cisco directly infringes the '556 patent through its direct involvement in the activities of its Cisco's alter ego, intermediaries, agents, distributors, importers, subsidiaries, members, segments, companies, brand, and/or customers, including by designing the Accused Products for U.S. consumers and selling and offering for sale the Accused Products directly to its related entities and importing the Accused Products into the United States for its related entities. On information and belief, Cisco and its alter egos, intermediaries, agents, distributors, importers, subsidiaries, members, segments, companies, brands, and/or consumers, conduct activities that constitute direct infringement of the '556 patent under 35 U.S.C. § 271(a) by

importing, offering for sale, selling, and/or using (including via testing) those Accused Products in the U.S. on behalf of and for the benefit of Cisco. Defendant Cisco is also vicariously liable for the infringing conduct of its alter egos, intermediaries, agents, distributors, importers, subsidiaries, members, segments, companies, and/or brands (under both the alter ego and agency theories). On information and belief, Defendant Cisco and its alter egos, intermediaries, agents, distributors, importers, subsidiaries, members, segments, companies, brands are essentially the same company (i.e., "Cisco"), operating in the U.S. via at least the Catalyst, Meraki, and Aironet brands, segments, mergers, or acquisitions of Cisco. Moreover, Cisco, as the parent company, along with its related entities, has the right and ability to control and/or delegate the control of the infringing activities of those subsidiary entities such that Cisco receives a direct financial benefit from that infringement.

111.    For example, Defendant infringes the '556 patent via Accused Products that utilize an "enhanced FILS active scanning" procedure performed by access points in Cisco's 802.11ax wireless networks. For example, Cisco provides at least "access points" (described above) that implement the active scanning and related probing functionalities to communicate stations in Cisco's wireless networks to infringe at least claim 9 (directed to a "method for active scanning performed by an access point"). Such Accused Products include Defendant's access points, their components, software/firmware, processes, methods, and related accessories. *See, e.g., Cisco Catalyst CW9166D1 Access Point Deployment Guide,* Cisco, *available at* https://www.cisco.com/c/en/us/products/collateral/wireless/catalyst-9164-series-access-points/catalyst-9166i-9164i-dg.html (Fig. 32 describes FILS feature) (last visited June 20, 2025).

112.    Those Accused Products include a "method for active scanning performed by an access point" comprising the limitations of claim 9. The technology discussion above and the example Accused Products provide context for Plaintiff's allegations that each of those limitations

is met. For example, the Accused Products include the steps of receiving, from a station, a probe request frame including signal strength information, and transmitting, to the station, a probe response frame in response to the probe request frame based on the information on the signal strength wherein an access of the station to the access point is based on the probe response frame and a maximum probe response time.

113.    At a minimum, Defendant has known of the '556 patent at least as early as the filing date of this Complaint. In addition, Defendant has known about its infringement of Golden Eye's patent portfolio, including infringement of the '556 patent, since at least its receipt of correspondence from Golden Eye's parent company, Harfang IP, to Cisco dated June 23, 2023. Moreover, claim charts addressing Cisco's infringement of the '556 patent were delivered to Cisco at least as early as June 23, 2023. The parties continued to correspond from June 2023 until at least August 2024. This sequence of correspondence notifies Defendant Cisco that its products practice at least the wireless controller technologies covered by the Golden Eye patent portfolio.

114.    Plaintiff has complied with all requirements of 35 U.S.C. § 287 relating to its assertion of infringement of the '556 patent by Cisco.  Specifically, Plaintiff does not make any products subject to the marking requirement of 35 U.S.C. § 287. Further, the method claims asserted are not subject to the marking requirements of 35 U.S.C. § 287. *See, e.g., Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.*, 559 F.3d 1308, 1316 (Fed. Cir. 2009).

115.    On information and belief, since at least the above-mentioned date when Defendant was on notice of its infringement, Defendant has actively induced, under 35 U.S.C. § 271(b), importers, online stores, distribution partners, retailers, channel partners, systems integrators, service providers, other third-party resellers, distributors, and contract manufacturers, consumers, other users, and other related service providers that import, distribute, purchase, offer for sale, sell,

or use (including via testing) the Accused Products that include or are made using all of the limitations of one or more claims of the '556 patent to directly infringe one or more claims of the '556 patent by using, offering for sale, selling, and/or importing the Accused Products. Since at least the date of notice provided above, Defendant has conducted infringing activities with knowledge, or with willful blindness of the fact, that the induced acts constitute infringement of the '556 patent. On information and belief, Defendant intends to cause, and have taken affirmative steps to induce, infringement by importers, online stores, distribution partners, retailers, channel partners, systems integrators, service providers, other third-party resellers, distributors, and contract manufacturers, consumers, other users, and other related service providers by at least, *inter alia*, creating advertisements that promote the infringing use of the Accused Products, creating and/or maintaining established distribution channels for the Accused Products into and within the United States. Moreover, Defendant manufactures, tests, and certifies the Accused Products in conformity with and to operate within U.S. laws and regulations, including, for example, the FCC and the Wi-Fi Alliance, specifically so that consumers may be induced to purchase and use the Accused Products. Also, Defendant distributes or makes available instructions or manuals for these products to consumers, installers, purchasers and prospective buyers, test and certify the wireless networking features (with for example the Wi-Fi Alliance) in the accused access points (i.e., Cisco Catalyst 9100 series Access Points and Meraki-branded Access Points), and provide technical support, product files and videos, or related services for these products to purchasers in the United States. *See, e.g., Cisco Catalyst CW9166D1 Access Point Deployment Guide*, Cisco, *available at* https://www.cisco.com/c/en/us/products/collateral/wireless/catalyst-9164-series-access-points/catalyst-9166i-9164i-dg.html (providing instructions for how to enable the FILS feature) (last visited June 20, 2025).

116.    Additionally, and alternatively, on information and belief, Cisco distributed, offered for sale, sold, used (including via testing) and/or imported in this District and elsewhere in the United States wireless networking features and processes, via the Accused Products, that formed a part, component, or process that was used by consumers (and others) to infringe the '556 patent. Cisco knew that such features and processes are specially made and adapted for use in infringing devices and methods claimed by the '556 patent, and that such features and processes are not a staple article or commodity of commerce suitable for substantial non-infringing use. On information and belief, users (e.g., at least Cisco's customers) of the Accused Products directly infringed one or more claims of the '556 patent by using the Accused Product or carrying out claimed methods with those Accused Products in this District and elsewhere in the United States when, for example, utilizing an "enhanced FILS active scanning" procedure performed by access points in Cisco's 802.11ax wireless networks to infringe the '556 patent in Cisco's wireless networks. This constitutes contributory infringement by Cisco under 35 U.S.C. § 271(c).

117.    On information and belief, despite having knowledge of the '556 patent and knowledge that it is directly and/or indirectly infringing one or more claims of the '556 patent, Defendant has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Defendant's infringing activities relative to the '556 patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, characteristic of a pirate, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

118.    Plaintiff Golden Eye has been damaged as a result of Defendant's infringing conduct described in this Count. Defendant is thus liable (including jointly and severally liable with its alter

egos, intermediaries, agents, distributors, importers, subsidiaries) to Golden Eye in an amount that adequately compensates Golden Eye for its infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## CONCLUSION

119.    Plaintiff is entitled to recover from Defendant the damages sustained by Plaintiff as a result of Defendant's wrongful acts in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court.

120.    Plaintiff has incurred and will incur attorneys' fees, costs, and expenses in the prosecution of this action. The circumstances of this dispute may give rise to an exceptional case within the meaning of 35 U.S.C. § 285, and Plaintiff is entitled to recover its reasonable and necessary attorneys' fees, costs, and expenses.

## JURY DEMAND

121.    Plaintiff hereby requests a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

122.    Plaintiff requests that the Court find in its favor and against Defendant, and that the Court grant Plaintiff the following relief:

A.    A judgment that Defendant has infringed either literally or under the doctrine of equivalents the Asserted Patents as alleged herein, directly and/or indirectly by way of inducement and contributory infringement of such patents;

B.    A judgment for an accounting of damages sustained by Plaintiff as a result of the acts of infringement by Defendant;

C.      A judgment and order requiring Defendant to pay Plaintiff damages under 35 U.S.C. § 284, including up to treble damages as provided by 35 U.S.C. § 284, and any royalties determined to be appropriate;

D.      A judgment and order requiring Defendant to pay Plaintiff pre-judgment and post-judgment interest on the damages awarded;

E.      A judgment and order finding this to be an exceptional case and requiring Defendant to pay the costs of this action (including all disbursements) and attorneys' fees as provided by 35 U.S.C. § 285; and

F.      Such other and further relief as the Court deems just and equitable.

Dated: August 27, 2025                            Respectfully submitted,

*/s/ Terry Saad*

    Terry A. Saad (lead attorney)
    Texas Bar No. 24066015
    E-mail: tsaad@bosfirm.com
    Jeffrey R. Bragalone
    Texas Bar No. 02855775
    E-mail: jbragalone@bosfirm.com
    Marcus Benavides
    Texas Bar No. 24035574
    E-mail: mbenavides@bosfirm.com
    Brandon V. Zuniga
    Texas Bar no. 24088720
    E-mail: bzuniga@bosfirm.com

**BRAGALONE OLEJKO SAAD PC**
901 Main Street
Suite 3800
Dallas, Texas 75202
Telephone:   (214) 785-6670
Facsimile:   (214) 785-6680

OF COUNSEL:

    Andrea L. Fair
    Texas Bar No. 24078488
    E-mail: andrea@millerfairhenry.com

**MILLER FAIR HENRY PLLC**
1507 Bill Owens Parkway
Longview, TX 75604
Tel: (903) 757-6400
Fax: (903) 757-2323

**ATTORNEYS FOR PLAINTIFF
GOLDEN EYE TECHNOLOGIES LLC**